ECKERSTROM, Chief Judge:
¶ 1 Cody Lohse appeals from his convictions and sentences for numerous drug-related offenses, arguing the trial court erred by denying his motions to suppress evidence. He contends law enforcement obtained a search warrant based on information gained by unlawfully trespassing into his curtilage and that the search warrant failed to describe his home with sufficient particularity. We vacate the decision of the trial court in part and remand for further proceedings.
Factual and Procedural History
¶ 2 "In reviewing a motion to suppress, we consider only the evidence presented at the suppression hearing and view the facts in the light most favorable to sustaining the trial court's ruling." State v. Gonzalez , 235 Ariz. 212, ¶ 2, 330 P.3d 969 (App. 2014). While investigating an aggravated assault in March 2015, an operations commander with the Cochise County Sheriff's Office received a tip that the assailant had been seen at Lohse's home and that Lohse could identify him. When the commander arrived at Lohse's home, he opened and walked through first the unlocked gate of a four-foot-high chainlink fence and then the gate of a six-foot-tall opaque, wooden, privacy fence. Although a witness testified that one of the fences also displayed a "private property sign,"[1] the commander testified only that there "could have been" such a sign, but he could not recall. In any event, the trial court did not make a factual determination concerning whether such a sign had been posted.
*609 After passing through both gates, the commander went straight to the front door where he knocked and identified himself.
¶ 3 When Lohse opened the door, the commander immediately smelled the odor of raw marijuana coming from inside the home. Lohse admitted there was a small amount of marijuana in the house, and another officer confirmed that no one present possessed a "medical marijuana card." See A.R.S. § 36-2801(13), (14). The commander then called narcotics detectives, who obtained a search warrant and discovered morphine, methamphetamine, marijuana, a handgun, a shotgun, and several items of drug paraphernalia.
¶ 4 Before trial, Lohse filed motions to suppress all evidence uncovered by the search of his home, arguing "sheriff's personnel trespassed into the curtilage of [his] home" and that the search warrant was invalid because it listed an address different than his own. Following a hearing, the trial court denied both motions, finding the officers had legitimately entered the curtilage pursuant to their community-caretaking function and, although the search warrant listed a neighbor's address, "the affidavit ... accurately describe[d] the residence actually served."
¶ 5 Following trial, the jury found Lohse guilty of possession of a narcotic drug, possession of marijuana, two counts of misconduct involving weapons, and five counts of possession of drug paraphernalia.[2] The trial court suspended imposition of sentence and placed Lohse on concurrent terms of probation, the longest of which were four years. Lohse appealed; we have jurisdiction. See A.R.S. §§ 13-4031, 13-4033(A)(1).
Community Caretaking
¶ 6 As a threshold matter, the trial court erred by determining the community-caretaking function justified the officers' intrusion into Lohse's curtilage. See State v. Mendoza-Ruiz , 225 Ariz. 473, ¶ 8, 240 P.3d 1235 (App. 2010). This function "arises from a police officer's status as a 'jack-of-all-emergencies,' who is 'expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing, and provide an infinite variety of services to preserve and protect community safety.' " Id. ¶ 9 (quoting United States v. Rodriguez-Morales , 929 F.2d 780, 784-85 (1st Cir. 1991) ). Accordingly, officers engaged in such tasks do not violate the Fourth Amendment. Id. The standard under this doctrine is whether a "prudent and reasonable officer [would] have perceived a need to act." Id. ¶ 8 (quoting State v. Organ , 225 Ariz. 43, ¶ 15, 234 P.3d 611 (2010) ) (alteration in Mendoza-Ruiz ). In Mendoza-Ruiz , officers entered the cab of a pickup truck to remove a gun that was "clearly visible" because, after its owner was arrested, the truck would be left in a busy, high crime area known for shootings and aggravated assaults. Id. ¶¶ 3, 12. Similarly, in In Re Tiffany O. , the community-caretaking function permitted an officer to seize a juvenile's purse after receiving a report that she had been suicidal; but it did not authorize them to search the purse because taking it from her neutralized any safety concern its contents may have presented. 217 Ariz. 370, ¶¶ 2, 26-31, 174 P.3d 282 (App. 2007).
¶ 7 Here, nothing in the record indicates officers entered the curtilage of Lohse's home to address any public-safety concern or prevent any harm from occurring. Rather, they were investigating an aggravated assault that "had been around for a while." As the commander recognized, making contact with Lohse was not "an urgent necessity"; he simply did not want "to delay [the investigation] any further." Because officers did not enter pursuant to the community-caretaking function, we now address whether they were otherwise privileged to enter the curtilage.
General License to Enter Curtilage
¶ 8 Lohse contends that by passing through two gates-one of which he asserts was marked with a "No Trespassing" sign[3] *610 -law enforcement officers had trespassed into the curtilage of his home and, therefore, were not in a lawful position to smell the odor of marijuana coming from his front door. "[W]e review de novo the [trial] court's legal conclusions drawn from the facts, as well as any constitutional issues." State v. Inzunza , 234 Ariz. 78, ¶ 7, 316 P.3d 1266 (App. 2014).
¶ 9 In relevant part, the Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches." A search within the meaning of the Fourth Amendment "undoubtedly occur[s]" when "the Government obtains information by physically intruding" into a person's home. Florida v. Jardines , 569 U.S. 1, 5, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) (quoting United States v. Jones , 565 U.S. 400, 406 n.3, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) ). The curtilage of a home "enjoys protection as part of the home itself." Id. at 6, 133 S.Ct. 1409 ("We ... regard the area 'immediately surrounding and associated with the home' ... as 'part of the home itself for Fourth Amendment purposes.' " (quoting Oliver v. United States , 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) ) ).
¶ 10 Nevertheless, the public has a general license-unless revoked-"to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id. at 8, 133 S.Ct. 1409. Like any private citizen, law enforcement officers, even those "not armed with a warrant," benefit from this license to approach the front door. Id. at 9, 133 S.Ct. 1409 (quoting Kentucky v. King , 563 U.S. 452, 469, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) ).
¶ 11 Here, the state does not contest that officers had entered the curtilage of Lohse's home when they knocked on his front door. Accordingly, we must determine whether the officers' entry was permitted by the general license or whether Lohse had effectively revoked it under the totality of the circumstances. See Grady v. North Carolina , --- U.S. ----, 135 S.Ct. 1368, 1371, 191 L.Ed.2d 459 (2015) (reasonableness of search depends on totality of circumstances).
¶ 12 Neither has the United States Supreme Court, nor any reviewing court in Arizona, squarely addressed the circumstances by which a resident revokes the general license to enter the curtilage and knock on the front door.[4] Numerous federal and state courts, however, have considered whether posting no-trespassing signs or erecting gates and fences revokes the general license or otherwise renders an officer's entry onto private property unlawful, warranting suppression.[5] Although a strong majority *611 have determined no-trespassing signs alone[6] or gates and fences alone[7] are insufficient to do so, the opposite is true when these measures are combined. See, e.g. , State v. Christensen , 131 Idaho 143, 953 P.2d 583, 587-88 (1998) (officer had no more right than door-to-door solicitor to disregard closed gate and no-trespassing sign); Bainter v. State , 135 So.3d 517, 520 (Fla. Dist. Ct. App. 2014) ; State v. Bullock , 272 Mont. 361, 901 P.2d 61, 75-76 (1995) ; State v. Roper , 254 Or.App. 197, 294 P.3d 517, 520 (2012) ; State v. Johnson , 75 Wash.App. 692, 879 P.2d 984, 992 (1994).
¶ 13 To resolve whether coupling no-trespassing signs with gates and fences revokes the general license, courts consider the totality of the circumstances to determine whether a resident has asserted an objectively reasonable expectation of privacy warning uninvited visitors they are not welcome. See Brown v. State , 152 So.3d 619, 623-24 (Fla. Dist. Ct. App. 2014) (also noting mailbox located outside gate); Bullock , 901 P.2d at 75-76 (cabin barely visible from road, forested area); Johnson , 879 P.2d at 992 (officers arrived after midnight). Concerning this combination of measures, the Idaho Supreme Court observed: "We believe that the reasonably respectful citizen when confronted with a closed gate and a no trespassing sign does not proceed further, but respects the request for privacy that such efforts convey." Christensen , 953 P.2d at 587-88 ; see also Roper , 294 P.3d at 520.
¶ 14 By contrast, those cases determining that a combination of no-trespassing signs and a fence or gate did not bar uninvited visitors have done so when officers entered through an open gate. See United States v. Bearden , 780 F.3d 887, 893 (8th Cir. 2015) ; Burdyshaw v. State , 69 Ark. App. 243, 10 S.W.3d 918, 921 (2000) (expectation of privacy in driveway not reasonable because "gates were open[ and] the driveway was not blocked"); State v. Smith , 246 N.C.App. 170, 783 S.E.2d 504, 510 (2016) (defendant who left gate open had not taken "consistent steps to physically prevent visitors from entering the property"). Because the open gates in these cases did not block people from entering the property, they suggested visitors were welcome to enter the property. Without such a barrier, the cases are more analogous to those involving only a sign; and the logic of these cases suggests that, had the gates been closed and signs posted, any implied license to enter would have been revoked. See Burdyshaw , 10 S.W.3d at 921 ; Smith , 783 S.E.2d at 510 ; see also State v. Christensen , 517 S.W.3d at 76-77 (Tenn. 2017) (noting closed gate may revoke license to approach).
¶ 15 Consistent with this weight of authority, a resident revokes the general license to approach the front door when circumstances clearly indicate that uninvited *612 visitors are not welcome. As the Idaho Supreme Court reasoned, a closed gate and no-trespassing sign communicate a clear demand for privacy that a reasonable member of the public will not breach apart from an explicit invitation. Christensen , 953 P.2d at 587-88. Here, the record suggests the public was presented with two barriers, the second opaque. Further, there was evidence those barriers were coupled with a warning sign discouraging entry. If true, a reasonable person would believe that Lohse had asserted an elevated privacy interest in the curtilage of his home. Thus, because law enforcement officers without a warrant are no more privileged to enter the curtilage of a home than the general public, see Jardines , 569 U.S. at 8-9, 133 S.Ct. 1409, entry under such circumstances would constitute an unreasonable search under the Fourth Amendment.
¶ 16 The state argues any sign could have "reasonably been construed as informing visitors not to go anywhere on the property outside of the pathway to Lohse's front door." While this interpretation may be reasonable when a no-trespassing sign is unaccompanied by other circumstances, the same cannot be said when such a sign has been posted on a privacy fence surrounding the curtilage of a home. Instead, the more reasonable message would be that uninvited visitors should not enter within the marked fence.
¶ 17 Here, however, we cannot resolve whether Lohse effectively revoked the general license because the trial court resolved the question under the community-caretaker exception and therefore did not make the requisite findings. Although it is undisputed from the record that Lohse's home was surrounded by a chainlink fence and an opaque privacy fence, and that officers opened both gates to enter the curtilage, it remains unresolved whether a private-property or no-trespassing sign had been posted on the day in question. We also note that a witness testified to additional signals that Lohse did not want to be disturbed by uninvited visitors: his mailbox was located on the street and security cameras were visibly in place. See Brown , 152 So.3d at 624. Again, if true, all these circumstances would demonstrate that Lohse had revoked the general license to approach, such that any evidence obtained as a result of an unlawful entry into his curtilage must be suppressed as fruit of the poisonous tree. State v. Schinzel , 202 Ariz. 375, ¶¶ 27-29, 45 P.3d 1224 (App. 2002). But these facts remained unresolved in the absence of trial-court findings.
¶ 18 Citing Jardines , the state argues that officers were privileged to enter the curtilage because they "went to Lohse's front door without any type of special investigatory tools that would put them in a better position than an ordinary visitor." But Jardines concerned what officers who have lawfully entered the curtilage may do, see 569 U.S. at 8-9, 133 S.Ct. 1409 ; the issue here is whether officers lawfully entered the curtilage in the first place.
¶ 19 Finally, the state argues it was "certainly possible that the trial court simply did not believe Lohse's witness that there was a no-trespassing sign in the first instance" and that it "implicitly den[ied]" that a sign had been posted. But, the absence of a no-trespassing sign was not necessary to whether the community-caretaking doctrine justified the officers' entry into the curtilage. See Horton v. Mitchell , 200 Ariz. 523, ¶ 13, 29 P.3d 870 (App. 2001). Thus, we cannot infer that the trial court made any findings regarding the measures Lohse had taken, particularly whether he had posted any sign.
¶ 20 Therefore, we remand to the trial court to make findings of fact to determine what circumstances existed on the day in question pertinent to whether Lohse had revoked the general license to approach and to determine what additional proceedings might be necessary, in light of those findings and consistent with this opinion.
Particularity of the Search Warrant
¶ 21 Finally, although we are remanding to the trial court to resolve outstanding factual questions, we nevertheless address Lohse's final assignment of error because it is an independent ground for suppression. Lohse complains the search warrant lacked sufficient particularity because it listed the wrong address and merely described his "trailer ... [as one] surrounded *613 by a chain-link fence in a world of trailers surrounded by chain-link fences." Whether a warrant is sufficiently particular is a constitutional issue we review de novo. State v. Dean , 241 Ariz. 387, ¶¶ 1, 4, 388 P.3d 24 (App. 2017).
¶ 22 The Fourth Amendment requires that warrants "particularly describ[e] the place to be searched." This requirement is satisfied "if the property is sufficiently recognizable from the description to enable the officer [executing the warrant] to locate the premises with definiteness and certainty" and "with reasonable effort." State v. Morgan , 120 Ariz. 2, 3, 583 P.2d 889, 890 (1978) (quoting People v. Watson , 26 Ill.2d 203, 186 N.E.2d 326, 327 (1962) ). In Morgan , the search warrant provided the address of another building on the same block as the subject property but included a written description of the place to be searched. 120 Ariz. at 3-4, 583 P.2d at 890-891. There, the executing officer had not relied on the address provided, but on the description of the apartment within the larger building. Id. Accordingly, the court concluded that "[n]otwithstanding the error in the address ..., the warrant described [the defendant]'s apartment with reasonable certainty and particularity." Id. at 4, 583 P.2d at 891.
¶ 23 Here, although the search warrant listed the address of another home on the same block, we agree with the trial court that it accurately described Lohse's home. Specifically, the warrant included such details as the color scheme of the home, the types of fences, that Lohse's truck was parked out front-even listing its make, model, license plate, and vehicle identification number-and most notably, "that Deputies [we]re standing by at the residence, awaiting the completion of a warrant to search the residence/property." Notwithstanding the erroneous address, the warrant more than sufficiently described Lohse's home with reasonable certainty and particularity. See id.
Disposition
¶ 24 We vacate the trial court's denial of Lohse's motion to suppress and remand for further proceedings consistent with this opinion.

In his briefing, Lohse asserts the sign read "No Trespassing." This contention, however, is unsupported by any testimony or evidence admitted at the hearing on the motion to suppress. Moreover, the trial court precluded the admission of the purported photograph of the sign on the state's objection that it lacked foundation. To the extent the court adopted the state's reasoning that the photograph lacked foundation because there was "no evidence as to who took it and when it was taken," we note that laying foundation for an image does not depend on who took the photograph and may not depend on when it was taken. See Ariz. R. Evid. 901. Rather, a witness may provide adequate foundation by "attest[ing] that the photograph[ ] accurately portray[s] the scene or object depicted" at the relevant time frame. State v. Haight-Gyuro , 218 Ariz. 356, ¶ 7, 186 P.3d 33 (App. 2008) (quoting Lohmeier v. Hammer , 214 Ariz. 57, ¶ 8, 148 P.3d 101 (App. 2006) ).

The jury acquitted Lohse of hindering law enforcement, possession of methamphetamine for sale, and four counts of misconduct involving weapons.

Although Lohse's characterization of the wording on the alleged sign differs from the testimony at the suppression hearing, we cannot conjure a meaningfully different message that an uninvited visitor would understand from a sign reading "private property" rather than "no trespassing." Thus, for the purposes of this opinion, we not only use the terms interchangeably, we assume for the sake of argument that Lohse had posted such a sign.

Lohse relies on State v. Jacot for the proposition that a no-trespassing sign is a factor in determining whether a resident has revoked this general license. 235 Ariz. 224, ¶ 13, 330 P.3d 981 (2014), depublished 238 Ariz. 296, 360 P.3d 92 (2015). However, because our supreme court ordered Jacot depublished, it carries no precedential or persuasive authority. See Ariz. R. Sup. Ct. 111(c)(1)(C) (memorandum decisions "are not precedential" and may be cited for persuasive value "only if ... the citation is not to a depublished opinion"); see also F.D.I.C. v. Adams , 187 Ariz. 585, 593, 931 P.2d 1095, 1103 (App. 1996) ("It is well-settled that a depublished opinion has no precedential effect and cannot be cited as authority in any court.").

A number of courts have resolved this issue on state-constitutional grounds; they do so, however, not to determine whether these measures communicate revocation of any license. Instead, they do so to determine whether to extend constitutional protection to areas beyond the curtilage. See State v. Bullock , 272 Mont. 361, 901 P.2d 61, 70-76 (1995) (Montana Constitution protects "open fields"); State v. Roper , 254 Or.App. 197, 294 P.3d 517, 519-20 (2012) (protecting land outside curtilage); State v. Johnson , 75 Wash.App. 692, 879 P.2d 984, 990-94 (1994) ; see also Oliver , 466 U.S. at 181, 104 S.Ct. 1735 ("an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers"). The instant case, however, does not concern the extent of constitutional protection-for it is well established that the curtilage of Lohse's home was so protected. Accordingly, these cases are instructive to the extent they address the means of invoking that protection; that is, whether a resident has clearly communicated that uninvited visitors are not welcome.
Lohse has not argued-and, therefore, we do not consider-whether the officers' entry violated Arizona's constitution. See State v. Jean , 243 Ariz. 331, ¶ 97, 407 P.3d 524 (2018) (Bolick, J., concurring in part and dissenting in part) (noting lack of argument on state constitutional grounds and inviting future litigants to develop such arguments).

Compare United States v. Carloss , 818 F.3d 988, 994-97 (10th Cir. 2016) (entry proper despite no-trespassing signs); Michel v. State , 961 P.2d 436, 438 (Alaska App. 1998) ; State v. Rigoulot , 123 Idaho 267, 846 P.2d 918, 923 (App. 1992) ; Jones v. State , 178 Md.App. 454, 943 A.2d 1, 12 (2008) ; State v. Christensen , 517 S.W.3d 60, 73-76 (Tenn. 2017) ; with State v. Roubique , 421 So.2d 859, 861, 862 (La. 1982) (reasonable expectation of privacy when no-trespassing signs posted by private road and isolated trailer "barely visible from the road"); People v. Scott , 79 N.Y.2d 474, 583 N.Y.S.2d 920, 593 N.E.2d 1328, 1338 (1992) (under state constitution, no-trespassing signs even protect open fields; expressly departing from Oliver , 466 U.S. 170, 104 S.Ct. 1735.)

Compare United States v. Perez-Diaz , 848 F.3d 33, 36, 39 (1st Cir. 2017) (entry through back gate proper because it "did not require force to open"); United States v. Robbins , 682 F.3d 1111, 1115 (8th Cir. 2012) (unlocked gate); Comm. v. Leslie , 477 Mass. 48, 76 N.E.3d 978, 981, 986 (2017) ("officers were entitled to open the front gate"); Porter v. State , 93 S.W.3d 342, 345 (Tex. App. 2002) (officers pushed open unlocked, motorized, remote-controlled gate); with State v. Ridgway , 57 Wash.App. 915, 790 P.2d 1263, 1265 (1990) (entry improper where gate blocked driveway to isolated home, hidden from road and neighbors, and barking guard dogs caused deputies to deviate from direct route to door); also Maloney v. Comm. , 489 S.W.3d 235, 241-42 (Ky. 2016) (suggesting "gate [ ]or any other restriction [would] indicate that the [porch] was an exclusively private area").